IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| M.Q., a minor child, by and through her parents and next friends, CHARLES and JOSEPHINE K., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 3:12-cv-313-WHA (WO) |
| PHENIX CITY BOARD OF EDUCATION, PHENIX CITY SCHOOL DISTRICT, DR. LARRY DiCHIARA, in his individual and official capacities, ANNE PHILLIPS, in her individual and official capacities, DAVID WILSON, in his individual and official capacities, JENNIFER DAWN YOUNG, in her individual capacity, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on two Motions for Summary Judgment filed on June 7,

2013.  The first Motion was filed by the Phenix City Board of Education ("the Board") and by

Dr. Larry DiChiara ("DiChiara"), Anne Phillips ("Phillips"), and David Wilson ("Wilson") in

their official capacities (Doc. #44), and the second Motion was filed by DiChiara, Phillips, and

Wilson in their individual capacities (Doc. #46).  The Plaintiff, M.Q., a minor child suing

through her mother Josephine K. and her stepfather Charles K., filed a Complaint in this case on

April 5, 2012, and later filed a First Amended Complaint (Doc. #39) on June 5, 2012, alleging

violations under 20 U.S.C. § 1681 *et seq.* ("Title IX"), violations of due process and equal

protection pursuant to 42 U.S.C. § 1983, and various state law claims.[1]  The Plaintiff seeks compensatory damages and also requests punitive damages, alleging that the actions of the Defendants were done with malice, recklessness, and with deliberate indifference toward the Plaintiff.  For the reasons to be discussed, the Motions for Summary Judgment are due to be GRANTED.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the

---

[1] In addition to the Defendants moving for summary judgment, the Plaintiff's Amended Complaint also brings claims against Jennifer Dawn Young and the Phenix City School District. In the Answer filed by the Board and DiChiara, Phillips, and Wilson in their official capacities (Doc. #40), paragraph 6 states that there is no legal entity known as the Phenix City School District.  The Plaintiff does not disagree.  Accordingly, M.Q.'s claims against the Phenix City School District will be dismissed.  Jennifer Dawn Young has not appeared in this case and the court will not discuss the claims brought against her.  When the court refers to the "Defendants" in this opinion, the term does not include Young.

record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III.  FACTS

The submissions of the parties establish the following facts, viewed in a light most favorable to the Plaintiff:

At the start of the 2010-2011 school year, the Plaintiff M.Q. was a ninth-grade student at Central Freshman Academy ("CFA"). Her junior varsity cheerleading coach was Jennifer Dawn Young ("Young"), an employee of the Phenix City Board of Education ("Board"), who worked at Central High School ("CHS"), a separate building from CFA. M.Q. and Young often exchanged

Facebook messages and emails, and Young gave M.Q. several gifts, including clothing and a Rolex watch.  The two became close, and on some occasions Young told M.Q. that she would commit suicide if M.Q. ever left her.

On October 10, 2010, Josephine K., M.Q.'s mother, discovered Facebook and email messages on M.Q.'s computer that had been sent between Young and M.Q.  Several of the exchanges stated that Young wanted M.Q. to erase their messages because Young did not want "anything to be misunderstood."  One of the messages was a letter in which Young stated that she loved M.Q. "like a sister" and "not in an inappropriate way."  The message from Young also stated that "you are the best thing that's happened to me . . . and I'd never do anything to jeapordize [sic] that.  Part of me would forever be missing without you."  Josephine K. went to CFA and showed Principal Anne Phillips ("Phillips") the last of four pages of messages she had copied, after which Phillips called Angela Clark, the School Resource Officer assigned to CFA and CHS by the Phenix City Police Chief ("SRO Clark").[2]  Officer Rogers, a police officer, arrived and asked Josephine K. some questions.  M.Q. was then checked out of school and Officer Rogers and Officer Jason Whitten accompanied Josephine K. and M.Q. to the Child Advocacy Center where M.Q. was interviewed.  Later that day, Officer Rogers came to M.Q.'s house and took her computer and told Josephine K. that he had told Young to stay away from M.Q.  Josephine K. told M.Q. that she was not to ride with Young anymore.

Josephine K. visited the school a second time on November 17, 2010.  She asked Phillips to remove Young as assistant cheerleading coach.  On that day Josephine K. also warned M.Q.

---

[2] Debbie Coulter ("Coulter") scheduled the meeting with Phillips and spoke for Josephine K. at the meeting.  Coulter is M.Q.'s godmother, and she assisted Josephine K. throughout the events giving rise to this case.

that she would be punished if she did not stay away from Young, which caused M.Q. to become

upset.  That afternoon, Josephine K. drove M.Q. to cheerleading before a JV basketball game,

unaware that M.Q. had overdosed on some pills from the house—later determined to be

Ibuprofen and Flexeril—in an apparent suicide attempt.  During the basketball game, the head

cheerleading coach noticed M.Q. acting strangely and drove her to the emergency room.  The

coach called Josephine K., who came to the hospital, and also called David Wilson ("Wilson")

the Director of Operations of the Board.  Wilson then called Dr. Larry DiChiara ("DiChiara"),

the Superintendent, to apprise him of the situation.  The next day Phillips and SRO Clark met to

discuss the incident.

        M.Q. was admitted into the Bradley Center, a psychiatric treatment facility, on November

18 and remained until November 23.[3]  On November 19, Josephine K. and Charles K., M.Q.'s

stepfather, and Debbie Coulter met with Wilson and showed him some other messages from

Young that instructed M.Q. to delete them and some gifts that Young had given M.Q.  This

meeting took place a day after Wilson learned that the same student that was in the hospital was

the one that was involved in the Young investigation.  Wilson then met with DiChiara, who

directed Wilson to speak to the police department about their investigation of the events

surrounding Young and M.Q.  Officer Rogers told Wilson that the police department was waiting

for the analysis of Young's computer.  Wilson and DiChiara decided to place Young on

administrative leave from her cheerleading duties, which Young protested, asking Wilson to ask

DiChiara to reconsider.  DiChiara refused to reconsider, and he and Wilson completed the letter

---

        [3] It appears that M.Q. was hospitalized on other occasions during the events of this
lawsuit, though it is not clear to the court how many times or when those hospitalizations
occurred.

that placed Young on administrative leave until further notice.  Wilson met with Young on

November 23 and gave her the letter.  M.Q. returned to school after the Thanksgiving holidays

on November 29, 2010.

At no time during these contacts by Josephine K. with school officials or officers did

Josephine K. say that she thought anything of a sexual nature was going on between Young and

M.Q.

M.Q. continued to have contact with Young.  Sometime in February 2011, M.Q. began

going from the CFA building to the CHS building almost every morning before school to visit

Young.  It was against school policy for students to go between campuses without permission.

M.Q. also visited the drama teacher at CHS on two occasions to cover up her visits with Young

and, when asked, told the monitor at CHS that she was there to visit the drama teacher.  One

morning at the end of February or the beginning of March, M.Q. went to Young's classroom

upset because M.Q. had just ended her relationship with her boyfriend.  After talking for a few

minutes, Young took M.Q. behind the bookshelf in her office and performed oral sex.

Afterwards, M.Q. went back to CFA for the rest of the school day and did not tell anyone what

had happened.  This was the only incident of any sexual contact by Young with M.Q.  M.Q. did

not visit Young in the CHS building again until the morning of March 4.

On March 3, 2011, Wilson was notified by the assistant principal at CHS that there were

reports that M.Q. had been visiting Young early in the mornings.  On March 4, SRO Clark met

with the assistant principal early to watch and see if M.Q. came to the CHS building.  When

M.Q. was discovered at CHS, Wilson and DiChiara discussed the matter, and that afternoon

DiChiara placed Young on administrative leave from all of her duties.  Young was instructed not

to be present on school grounds or to have contact with any student.  On March 11, 2011, Young

resigned from her employment with the Board.  There is no evidence that any school officials had

any knowledge at that time of the single sexual contact with M.Q. by Young.

## IV.  DISCUSSION

Five of the counts in M.Q.'s Amended Complaint (Doc. #39) are at issue.  Count One is a

claim against the Board for alleged violations of Title IX, 20 U.S.C. § 1681 *et seq.*  Count Two is

brought against all Defendants pursuant to 42 U.S.C. § 1983 for alleged violations of M.Q.'s due

process and equal protection rights under the Fourteenth Amendment.  Counts Four, Five, and

Six are comprised of various claims against all Defendants of negligence and wantonness which

allegedly resulted in injury to M.Q. over the course of the events leading up to this suit.[4]

The Defendants filed two Motions for Summary Judgment: the first was filed on behalf of

the Board and the official capacity Defendants (Doc. #44) and the second was filed on behalf of

the individual capacity Defendants (Doc. #46).

### A.  Title IX Claim – Count One

Count One of the Plaintiff's Amended Complaint alleges that the Board[5] unlawfully

discriminated against M.Q. on the basis of sex in violation of Title IX, 20 U.S.C. § 1681 *et seq.*

---

[4] Counts Three, Seven, and Eight are brought only against Young.

[5] M.Q. does not bring Count One against DiChiara, Phillips, and Wilson although she alleges that the school officials had actual knowledge of Young's misconduct and failed to promulgate a sexual harassment complaint policy.  However, even if M.Q. brought Count One against DiChiara, Phillips, and Wilson, that claim would fail because "Title IX does not allow claims against individual school officials; only funding recipients can be held liable for Title IX violations."  *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300 (11th Cir. 2007) (citing *Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999)).

As codified, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.  To support her claim under Title IX, M.Q. alleges that the Defendants had actual and constructive knowledge of Young's misconduct and failed to institute corrective measures to remedy Title IX violations, despite their authority to do so.  The claim also states that the Defendants had no official grievance procedure for bringing sexual harassment complaints and had no formal anti-harassment policy, and that the Defendants should have performed a background check on Young prior to her employment.  Finally, M.Q. alleges that the Defendants knowingly permitted a hostile environment which contributed to their discrimination against M.Q.

In its brief filed with its Motion for Summary Judgment, the Board argues that M.Q. cannot meet the standard to hold a school board liable for the sexual harassment of a student by one of its teachers.[6]  In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1998), the Supreme Court made plain that not all sexual harassment by a teacher would make a school district liable, stating that "Title IX is predicated upon notice to an appropriate person and an opportunity to rectify any violation."  A school board is liable only when "an official of the school district who at a minimum has authority to institute corrective measures on the district's

---

[6]  The Board also argues that because M.Q. was sixteen at the time of the alleged sexual acts and could therefore legally consent to them, Young's actions did not rise to the level of sexual harassment but instead were at most "sexual misconduct," to which Title IX does not apply.  However, a student's age does not determine whether Title IX applies.  "Title IX creates the right not to be subjected to sexual harassment when the school has knowledge of that harassment, fails to prevent it, and such harassment interferes with the student's education," regardless of the student's age.  *Benefield ex rel. Benefield v. Bd. of Trs. of Univ. of Ala. at Birmingham*, 214 F. Supp. 2d 1212, 1218–19 (N.D. Ala. 2002) ("Title IX does not create separate rights for individuals based on their age.").

behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Id.* at 277. Therefore, to prove liability, a plaintiff must (1) identify a school official with authority to take corrective action; (2) show that the school official had actual notice of the possibility of sexual harassment; and (3) show that the school official with such notice exhibited deliberate indifference to the harassment. *Doe v. Sch. Bd. of Broward Co., Fla.*, 604 F.3d 1248, 1254 (11th Cir. 2010) (citing *Gebser*).

Appropriate Person

The *Gebser* opinion did not specify which school official in particular a Title IX plaintiff must identify; it simply stated that the official must have "authority to institute corrective measures." *Gebser*, 524 U.S. at 277. The Eleventh Circuit touched on this issue in *Floyd v. Waiters*, which the Supreme Court vacated and remanded for further consideration in light of *Gebser*, and which the Eleventh Circuit then reinstated after analyzing the Supreme Court's opinion. *See Floyd v. Waiters*, 133 F.3d 786 (11th Cir. 1998), *vacated*, 525 U.S. 802, *reinstated*, 171 F.3d 1264 (11th Cir. 1999), *cert. denied*, 528 U.S. 891 (1999). In the court's reinstatement of *Floyd*, it commented that the appropriate school official must be someone "high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." *Broward*, 604 F.3d at 1255 (quoting *Floyd*, 171 F.3d at 1264, *cert. denied*, 528 U.S. 891 (1999)).

In the present case, M.Q. has not identified which of the school officials is the "appropriate person" in this case; however, she alleged in Count One that "all named Defendants" had actual and constructive knowledge of Young's misconduct. In addition, the record is not clear as to the precise duties and authority of DiChiara, Phillips, and Wilson as

officials of the Board, although as the Superintendent of the Board, the Principal of M.Q.'s school, and the Director of Operations of the Board, respectively, it is reasonable to assume that each of the officials could have intervened to remedy Young's misconduct.  Therefore, the court will assume that DiChiara, Phillips, and Wilson each had sufficient authority to institute corrective measures in this case and will discuss the other requirements of the Title IX analysis as they apply to each of the school officials.

Actual Notice

The second requirement of a Title IX teacher-on-student harassment claim is that the identified school official had actual notice of the possibility of sexual harassment.

Phillips, the Principal of CFS, first learned of Young's messages to M.Q. from Josephine K. at their meeting in October 2010.  A police investigation was instituted as a result.  Young was told by the police officers to stay away from M.Q., and M.Q. was told by her mother not to ride with Young anymore.

Phillips's next contact involving M.Q. was on November 17, when Josephine K. met with her at the school and asked Phillips to remove Young as assistant cheerleading coach.  Josephine K. also warned M.Q. on that day that she would be punished if she didn't stay away from Young.  She then drove M.Q. to cheerleading before a basketball game, and it was during the game that M.Q. was taken to the hospital.  Phillips found out that M.Q. was in the hospital for an overdose of medication either on November 17—the night of that incident—or the next morning.

Wilson, the Board's Director of Operations, and Superintendent DiChiara both learned about that incident on November 17, when M.Q.'s coach called Wilson from the hospital.  On November 19, Wilson met with M.Q.'s family and learned more about the content of the

messages and the gifts Young had given to M.Q.  This was also the day after Wilson realized that the same student that was taken to the hospital was the one involved in the Young investigation, and the day after M.Q. was admitted to the Bradley Center.  At this point, no one in M.Q.'s family had told any of the school officials they met with that they suspected M.Q. and Young's relationship to be sexual in nature.  After meeting with M.Q.'s family, Wilson relayed the details of the meeting to DiChiara, who instructed Wilson to speak to the police department about the Young investigation.  When Wilson was told by Officer Rogers that the police were waiting for analysis of Young's computer, he took the information to DiChiara, and they agreed that Young should be removed from her cheerleading responsibilities.

        None of the three school officials had knowledge of anything further going on in the Young investigation or with M.Q. until early March 2011, when Wilson learned from the assistant principal at CHS that M.Q. had been coming to the CHS campus in the mornings to visit Young.  Wilson and DiChiara discussed the matter, and DiChiara placed Young on administrative leave from all of her duties on March 4.  In the letter given to Young, DiChiara wrote that Young was advised not to have any contact with any student enrolled at the school and was not to be present on any school campus.  At this point, M.Q. had not told anyone that Young had performed a sexual act on her during one of her visits to Young's classroom.  Young resigned on March 11.

        Actual notice may be satisfied in a variety of ways.  If M.Q. showed that DiChiara, Phillips, or Wilson had knowledge that Young was sexually harassing M.Q., or if they actually knew of instances of sexual harassment by Young toward other students sufficient to alert them of the possibility of Young sexually harassing M.Q., the actual notice requirement would be

satisfied.  *See J.F.K. v. Troup Co. Sch. Dist.*, 678 F.3d 1254, 1260 (11th Cir. 2012).  Also, in

some circumstances, "lesser harassment may still provide actual notice of sexually violent

conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter."

*Broward*, 604 F.3d at 1258 (citing *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d

1282, 1294 (11th Cir. 2007), in which the Plaintiff's claim withstood a motion to dismiss when

the University knew that her attacker had a history of lesser sexual harassment but failed to

monitor him).  The teacher accused of harassing the Plaintiff in *Broward* had been accused in

two prior instances of sexually harassing students, and although the prior incidents were

unconfirmed, the Eleventh Circuit held that the similarity of the prior complaints to the

Plaintiff's raised a material issue of fact on the actual notice issue.  *Id.* at 1259.

     *J.F.K.* is analogous to the present case.  In that case, a female teacher had sexually

molested her twelve-year-old student on multiple occasions.  *See J.F.K.*, 678 F.3d at 1256.  The

victim's parents sued the school district, alleging that the school's principal had sufficient notice

of the teacher's inappropriate behavior toward students based on various complaints from parents

and reports from other teachers.  The principal knew that the teacher had encouraged students to

lie to their parents about skipping class, given the victim expensive gifts, texted students

excessively, verbally abused female students, was possessive of the victim, and sat close to the

victim on a couch under a blanket.  *Id.* at 1257–59.  The court concluded that, although the

principal knew the teacher's conduct was "inappropriate, devoid of professionalism, and reeked

of immaturity," the conduct was not of a sexual nature and "was not enough to put the principal

on actual notice that there was a risk of sexual harassment."  *Id.* at 1260–61.

The behavior exhibited by Young toward M.Q. and reported to DiChiara, Phillips, and Wilson is similar to the type of conduct exhibited by the teacher in *J.F.K.*, but even less severe. Young often communicated with M.Q. through email and Facebook messages and expressed her love "like a sister" for M.Q., and Young gave M.Q. gifts and paid her other special attention. Although inappropriate, Young's actions were not sexual in nature until early March.  M.Q. testified in her deposition that Young only touched her sexually on one occasion and did not make sexual advances until that time.  DiChiara, Phillips, and Wilson all had knowledge in the fall of the messages and gifts given to M.Q., and they knew that M.Q. was hospitalized when she took an overdose of pills after being told to stay away from Young.  However, like the principal in *J.F.K.*, none of the school officials involved with the situation had enough information to provide actual notice of the risk of sexual misconduct.  And, of course, the evidence in this case shows no knowledge of any sexual contact at all before Young was placed on administrative leave for continuing to allow M.Q. to visit her.  Considering the undisputed facts in the light most favorable to M.Q., the court finds that there is not sufficient evidence to create a genuine issue of material fact as to whether DiChiara, Phillips, and Wilson had actual notice of the possibility that Young would sexually harass M.Q.

<u>Deliberate Indifference</u>

Even if the second requirement of the Title IX framework was fulfilled in this case, "[i]n addition to requiring that an appropriate person have actual notice of the teacher's misconduct, a Title IX plaintiff must show that the official was deliberately indifferent to that misconduct." *Broward*, 604 F.3d at 1259 (citing *Gebser*, 524 U.S. at 277).  "Deliberate indifference is an exacting standard; school administrators will only be deemed deliberately indifferent if their

response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)). In other words, an official decision not to remedy the violation will satisfy the deliberate indifference requirement. *Id.* The evidence in this case does not show that the responses of DiChiara, Phillips, or Wilson to Young's conduct were clearly unreasonable based on the known information about Young—none of the school officials that knew about Young's behavior exhibited deliberate indifference to her misconduct.

The Eleventh Circuit in *Broward* held that there was an issue of fact as to whether the school board was deliberately indifferent to a teacher's alleged sexual misconduct. *Id.* at 1260. The court reached that conclusion even though the principal and the school board took some action in response to the sexual allegations by three students against the teacher; the court stated that the level of action taken was excusable after the first student's allegation of misconduct but not after the later charges of sexual harassment by two other students. *Id.* After the first student complained of harassment, the principal obtained written statements from the teacher and the student, timely reported the incident to the school board's investigation unit, and requested a formal investigation, resulting in the teacher being placed on administrative leave for the rest of the semester. The school board reviewed the results of the investigation and concluded there was no cause to discipline the teacher further.

The court held that it was after the second student complained of harassment by the same teacher during the same school year that the reasonableness of the school board's response came into question. *Id.* at 1261. In light of the known circumstances of the previous complaint, the principal's "failure to institute any corrective measures aimed at ferreting our the possibility of

14

[the teacher's] sexual harassment could constitute deliberate indifference." *Id.* The court stated that although "a school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective," a school district could become deliberately indifferent if it "has knowledge that its remedial action is inadequate and ineffective" and does not take reasonable steps to eliminate the misconduct. *Id.* (internal citations omitted).

When Josephine K. first told Phillips about the content of the messages sent between Young and M.Q., Phillips immediately called SRO Clark and contacted the local police to investigate. The messages, although inappropriate, did not suggest that sexual misconduct or harassment was taking place. When DiChiara, Phillips, and Wilson learned about M.Q.'s hospitalization which implicated her relationship with Young, Young was promptly removed from her cheerleading responsibilities while M.Q. was separated from her at the Bradley Center. Nothing further took place until March, when DiChiara placed Young on indefinite administrative leave after he learned that M.Q. was visiting Young at another campus. All of these responses took place before it was discovered that Young had performed oral sex on M.Q., and M.Q. stated that Young had never confronted her sexually before that time. There was no reason for DiChiara, Wilson, or Phillips to take more action than they did upon learning of the details of M.Q. and Young's relationship, especially since, unlike *Broward*, there was no evidence that sexual harassment occurred before early March 2011, when Young was placed on indefinite administrative leave. The court finds that the school officials' conduct in response to learning of Young's behavior was not clearly unreasonable and therefore not deliberately indifferent in light of the known circumstances.

Because there is no genuine issue of material fact that the school officials did not have actual notice of sexual misconduct of Young and that, in any event, the officials did not act with deliberate indifference after learning of misconduct, the Board is due summary judgment on Count One of M.Q.'s Amended Complaint.

## B.   Due Process and Equal Protection Claims – Count Two

Count Two of M.Q.'s Amended Complaint claims pursuant to 42 U.S.C. § 1983 that she was deprived of her rights of due process and equal protection under the Fourteenth Amendment. M.Q. alleges that DiChiara, Phillips, and Wilson are "personally liable in their supervisory capacity" for failing to take corrective action upon learning that Young violated M.Q.'s constitutionally protected right to be free of sexual harassment at school.  M.Q. also alleges that DiChiara, Phillips, and Wilson's failure to stop the sexually hostile environment constituted deliberate indifference to M.Q.'s rights and sanctioned Young's conduct.  In addition, the claim alleges that the individual Defendants and the Board followed improper customs or policies, such as failing to perform a proper background check on Young, that contributed to the violation of M.Q.'s rights.[7]

Due Process

The individual capacity Defendants contend that they are entitled to qualified immunity and move for summary judgment based on the Eleventh Circuit's decision in *Hartley v. Parnell*, 193 F.3d 1263 (11th Cir. 1999).  Qualified immunity offers complete protection to an individual

---

[7] In the brief submitted by the official capacity Defendants and the Board (Doc. #45), those Defendants claim that they are not named in Count Two of the Amended Complaint. However, because the Amended Complaint alleges that the Board had a custom or policy that resulted in deliberate indifference to the violation of M.Q.'s rights, the court will discuss the Board's alleged liability under § 1983.

government official acting within his discretionary authority unless a plaintiff shows that the official violated the plaintiff's clearly established constitutional right. *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003). The parties do not dispute that the individual capacity Defendants were acting with discretionary authority during the events of this case; therefore, the burden shifts to M.Q. to show that the Defendants are not entitled to qualified immunity. *Broward*, 604 F.3d at 1265. M.Q. alleges that DiChiara, Phillips, and Wilson are liable for Young's violation of her constitutional rights in their supervisory capacity. In response, the Defendants contend that the facts of this case are similar to *Hartley*, and that based on that case M.Q. cannot establish supervisory liability for the acts of Young.

In *Hartley*, a sixteen-year-old female student was inappropriately touched and kissed by a male teacher on a school field trip. *Id.* at 1266. When the student's father reported the incident to Parnell, the school superintendent, the father mentioned that the district attorney had begun an investigation. Parnell made arrangements to place the student, Hartley, in a different class and then met with the teacher to discuss Hartley's allegations. The teacher said that the touching and kissing was an accident, which Parnell believed. Parnell did not conduct any further investigation, and when the teacher was arrested and pleaded guilty to misdemeanor harassment, Parnell recommended to the school board that the teacher be placed on one year of probation with a letter of reprimand in his file. The board rejected Parnell's recommendation, and a few months later the Alabama State Board of Education revoked the teacher's teaching certificate. *Id.* at 1267. Hartley brought claims against Parnell for violating her substantive due process and equal protection rights. *Id.* at 1268–69.

In its discussion of Hartley's due process claim, the court first stated that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'"  *Id.* at 1269 (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)).  It then stated that supervisory officers are liable under § 1983 when the supervisor personally participates in the alleged violation or when "there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."  *Id.*  "The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."  *Id.*  To fulfill the notice requirement, the deprivations constituting "widespread abuse" must be "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  *Id.*  It was undisputed that Parnell did not personally participate in the sexual abuse of Hartley.  *Id.*  There was also no evidence of prior inappropriate acts by the teacher that would have put Parnell on notice of potential sexual abuse, and the court noted that Parnell had not instituted any sort of policy that would have led the teacher to believe that sexual abuse of students was permitted.  *Id.*  The court stated that Parnell did not violate Hartley's right to due process and held should have been granted qualified immunity on the substantive due process claim.  *Id.*

The Defendants argue that because neither DiChiara, Phillips, nor Wilson personally participated in the alleged sexual harassment and because there was no history of inappropriate acts by Young that would have placed them on notice that Young would sexually harass M.Q., the Defendants did not violate M.Q.'s substantive due process rights.  In addition, they argue that there is no evidence of any policy at the school that would have led Young to believe that sexual

harassment of M.Q. was permissible.  For purposes of their argument, the Defendants concede that M.Q. had a constitutional right not to be sexually abused by Young; however, they do not concede that Young deprived M.Q. of that right.  For purposes of this discussion the court will assume that Young violated M.Q.'s right not to be sexually abused at school.

The court finds that M.Q. cannot show the requisite causal connection to establish the individual capacity Defendants' supervisory liability for the alleged constitutional violation committed by Young.  The Defendants did not have notice of Young's actions based on her "history of widespread abuse" or the Defendants' "custom or policy" of deliberate indifference. "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous."  *Broward*, 604 F.3d at 1266 (internal citation omitted).  The only evidence of Young's inappropriate behavior toward M.Q. is the messages exchanged between them and gifts given to M.Q. by Young.  Although this evidence shows that Young and M.Q. had formed a close attachment that was improper for a coach-student relationship, Young's conduct as shown by this evidence does not comprise a "history of widespread abuse" that would put the Defendants on notice of the possibility of her future single sexually abusive act.  *See id.* (holding that two prior instances of sexual harassment by teacher did not rise to necessary level of "obvious, flagrant, rampant and of continued duration") (quoting *Hartley*, 193 F.3d at 1269). In addition, the evidence is insufficient to establish a custom or policy of deliberate indifference to students' constitutional rights.  None of the evidence establishes that the Defendants, as supervising officials, "had any sort of policy in place prior to the sexual abuse which could have led [Young] to believe that sexual abuse of students was permitted."  *Hartley,* 193 F.3d at 1269.

Therefore, DiChiara, Phillips, and Wilson are entitled to qualified immunity on the substantive due process claim.

Equal Protection

The individual capacity Defendants also rely on *Hartley* in arguing that they are due summary judgment on M.Q.'s equal protection claim under § 1983.  The court in *Hartley* rejected the plaintiff's argument that Parnell violated her equal protection rights by deciding not to terminate or suspend the offending teacher after learning of the allegations of sexual abuse.  *Id.* at 1269–70.  The court held that because Hartley did not suffer any further sexual abuse or harm of any sort after Parnell learned of her allegations, Parnell did not deprive her of her equal protection rights.  *Id.* at 1269.  In this case, M.Q. did not suffer any sexual harassment after March 4, 2011, when school officials learned that she had been visiting Young and placed Young on administrative leave.  In addition, although M.Q. was hospitalized and attended counseling sessions after she overdosed on medication on November 17, 2010, M.Q. took the pills in response to Josephine K. warning her to stay away from Young, and not in response to Young's inappropriate behavior which the school officials allegedly could have prevented.  In fact, after the events of November 17, Young was placed on administrative leave from her cheerleading duties and told to stay away from Young—an action that the school officials took before any allegations of sexual misconduct had been made.

In comparing the present case to *Hartley*, the court finds that the individual capacity Defendants reacted with more caution than did Parnell, whom the Eleventh Circuit found had not violated Hartley's right to equal protection.  Immediately after discovering Young and M.Q. together after Young had been warned to stay away from M.Q., Young was put on indefinite

administrative leave with instructions not to enter school property.  M.Q. did not suffer any

further harm after these actions; therefore, DiChiara, Phillips, and Wilson did not violate M.Q.'s

equal protection rights and are due qualified immunity on that claim.

Municipal Liability

Count Two of M.Q.'s Amended Complaint also alleges that the Board had a custom or

policy that resulted in deliberate indifference to complaints of sexual harassment by teachers.

However, since there is no evidence demonstrating that school officials employed by the Board

were deliberately indifferent to the complaints of alleged teacher-student sexual harassment,

M.Q. cannot show that the Board had a custom of responding to teachers' discriminatory actions

with deliberate indifference.  *See Sauls v. Pierce Co. Sch. Dist.*, 399 F.3d 1279, 1288 (11th Cir.

2005); *see also Gebser*, 524 U.S. at 277.  To the extent that Count Two alleges a § 1983 claim

against the Board, the Board is due summary judgment on that claim.

## C.  State Law Claims – Counts Four, Five, and Six

Counts Four, Five, and Six of M.Q.'s Amended Complaint allege state law claims against

the Defendants.  Count Four alleges negligence and wantonness against DiChiara, Phillips, and

Wilson for leaving Young in the presence of M.Q. after learning of Young's inappropriate

behavior, failing to conduct a proper background check on Young, and failing to report under the

Alabama Child Abuse Reporting Act, Ala. Code § 26-14-1 *et seq.*  M.Q. claims damages

resulting from the physical and emotional trauma surrounding Young's sexual misconduct and

M.Q.'s suicide attempt.  In Count Five, M.Q. alleges that DiChiara, Phillips, and Wilson

negligently and wantonly hired and retained Young, causing the same injuries to M.Q.  Count Six

is a claim for negligence and wantonness brought against the Board and DiChiara, Phillips, and

Wilson in both their individual and official capacities.  The other state law claims in the
Amended Complaint are brought only against Young.

The brief submitted by the Board and the official capacity Defendants argues that they are
entitled to sovereign immunity as to all of M.Q.'s state law claims.  Section 14 of the Alabama
Constitution provides that "the State of Alabama shall never be made a defendant in any court of
law or equity.  It is well settled in Alabama that local school boards are agencies of the State, not
of the local governmental units they serve, and they are entitled to the same absolute immunity as
other agencies of the State." *Ex parte Phenix City Bd. of Educ.*, 109 So. 3d 631, 632 (Ala. 2012)
(quoting *Ex parte Montgomery Co. Bd. of Educ.*, 88 So. 3d 837, 841 (Ala. 2012) (quotation
marks omitted)).  This protection extends to city boards of education sued in tort actions.  *Ex
parte Phenix City Bd. of Educ.*, 67 So. 3d 56, 59 (Ala. 2011) (citing *Enterprise City Bd. of Educ.
v. Miller*, 348 So. 2d 782, 784 (Ala. 1977)).  DiChiara, Phillips, and Wilson also have immunity
in their official capacities as employees of the Board.  *See Ex parte Montgomery Co.*, 88 So. 3d
at 842 (citing *Ex parte Dangerfield*, 49 So. 3d 675, 681 (Ala. 2010) (holding that all claims
against a state official in his or her official capacity seeking damages are barred by doctrine of
immunity)).

Immunity from the state law claims also extends to the Defendants in their individual
capacities.  A person who acts as the agent of a city board of education shares in its sovereign
immunity in his or her individual capacity "when the conduct made the basis of the claim against
the agent is based upon the agent's . . . exercising judgment in the discharge of duties imposed by
statute, rule, or regulation in . . . educating students." *Id.* at 842–43 (quoting *Ex parte Cranman*,
792 So. 2d 392, 405 (Ala. 2000)).  This immunity is not absolute—once a defendant has

established that the plaintiff's claims arise from a function entitling the state agent to immunity, the burden shifts to the plaintiff to show that the defendant acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* at 843. (quoting *Ex parte Cranman*, 792 So. 2d at 405).  M.Q. has not disputed that the individual capacity Defendants were acting with discretionary authority in their roles educating students or that they exceeded their authority.  However, M.Q. has alleged that DiChiara, Phillips, and Wilson acted wantonly by failing to conduct a proper background check of Young, leaving Young in the presence of M.Q. after learning of her inappropriate behavior, failing to report under the Alabama Child Abuse Reporting Act, hiring and retaining Young, and generally causing injuries to M.Q.  In the damages section of M.Q.'s Amended Complaint, she also alleges that the Defendants' acts were done with recklessness, deliberate indifference, and malice.

The Defendants contend that M.Q. has not carried her burden to show that their conduct was willful or malicious.  M.Q.'s Response to the Defendants' briefs does not address their arguments that the school officials acted within their discretion in the performance of their duties when reacting to the situation with M.Q. and Young.  The record does not contain any evidence that DiChiara, Phillips, or Wilson acted willfully or maliciously in response to the complaints made by Josephine K. about Young or to the discovery that M.Q. had been visiting Young in violation of school rules.  In addition, M.Q. has not shown any school policy or custom that the Defendants violated during the events of this case.

M.Q. alleges that the individual capacity Defendants failed to report that M.Q. was suspected to be a victim of child abuse to a duly constituted authority as made mandatory by the Alabama Child Abuse Reporting Act, Ala. Code § 26-14-1 *et seq.*  The Defendants argue that

23

when Phillips called SRO Clark into her office, who was a law enforcement official assigned to the school, while Josephine K. showed Phillips some of the messages from Young to M.Q., resulting in a police investigation, that the mandatory reporting requirement in the Act was fulfilled.  M.Q. makes no responsive argument to the Defendants' contentions, and the court finds that she has not shown that the Defendants willfully or maliciously failed to report as required by law.

Finally, Count Five of the Amended Complaint alleges that DiChiara, Phillips, and Wilson were wanton in hiring and retaining Young as an employee.  In response to this allegation the Defendants state that they, as individuals, do not have authority to hire, retain, or terminate school employees, and that the Board is the only entity having that authority.  *See* Ala. Code §§ 16-12-16 and 16-11-17 (establishing that the superintendent nominates employees of the Board and recommends them for dismissal, and that the Board dismisses its employees for misconduct). Although DiChiara in his official capacity as superintendent makes his recommendation to the Board for hiring and retaining employees, he is entitled to sovereign immunity as discussed above, as is the Board.  DiChiara, Phillips, and Wilson do not have the authority as individuals to hire and retain employees, and so to the extent that Count Five alleges that the individual capacity Defendants were wanton in their duties, the Defendants are due summary judgment on that claim.

In considering the evidence of the actions of the Board and DiChiara, Phillips, and Wilson in both their official and individual capacities, the court finds that they are entitled to sovereign and state agent immunity and that M.Q. has not shown otherwise.  Therefore, the

Defendants are due summary judgment on the state law claims brought against them in Counts Four, Five, and Six.

## V.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1.  The Motion for Summary Judgment filed by the Board and DiChiara, Phillips, and Wilson in their official capacities (Doc. #44) is GRANTED, and judgment is entered in favor of those Defendants and against M.Q. on those claims.

2.  The Motion for Summary Judgment filed by DiChiara, Phillips, and Wilson in their individual capacities (Doc. #46) is GRANTED, and judgment is entered in favor of those Defendants and against M.Q. on those claims.

3.  All claims brought against the Phenix City School District are DISMISSED.

4.  This case will proceed against Defendant Young on all claims.

Done this 5th day of August, 2013.

 /s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

25